HAIN, Appellant, vs. CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY, Respondent.

*March 13—March 31, 1908.*

*Railroads: Collisions at street crossings: Contributory negligence: Duty to look and listen: Diversion of attention.*

1. In an action to recover the value of horses and other property destroyed at a street crossing by being struck by a passenger train running at an unlawful rate of speed, the evidence is *held*, as matter of law, to establish that the driver of the horses was guilty of contributory negligence, either in failing to look before going onto the crossing or in attempting to cross in front of the train with knowledge of its approach.

2. The duty to look and listen before going onto a railroad crossing is absolute, where the opportunity exists, and is not excused by mere diversion of attention, except there be circumstances for which the traveler is not responsible which so irresistibly force his attention to something else as to deprive him of his opportunity to perform his duty.

3. A freight train on a siding near a street crossing at a station was something naturally to be expected by one familiar with such station and its surroundings, and did not constitute such a diversion as to deprive a traveler approaching the crossing of his opportunity to look.

APPEAL from a judgment of the circuit court for Dane county: E. RAY STEVENS, Circuit Judge. *Affirmed.*

The plaintiff sues to recover the value of a team of horses which were killed and his wagon which was destroyed by

reason of a collision with one of defendant's passenger trains at the Fulton-street crossing in the city of Edgerton on the morning of March 23, 1906. The situation will be better understood by reference to the diagram of the *locus in quo* found on page 305.

Fulton street runs nearly due east and west and the railway right of way and track deflects to the southeast and northwest, making an acute angle with the street at the crossing; a large tobacco warehouse stands just south of the crossing as indicated on the map, and a freight car stood in front of and at the extreme west end of the warehouse on the side-track next to the warehouse at the time of the accident. The train in question was the regular passenger train from the west, due at Edgerton at 10:01 a. m. On the morning of the accident this train was about nine minutes late at Stoughton (about ten miles west) and had made up several minutes during the run to Edgerton, and was approaching the station at Edgerton (a few hundred feet east of the Fulton-street crossing) at a speed variously estimated at from twenty to sixty miles per hour, but at any event at greater speed than allowed by law. A cut some 600 feet in length existed just west of the Fulton-street crossing. A freight train headed west drawn by two engines, with steam escaping from the exhausts, was standing on the passing track just east of the crossing awaiting the arrival of the passenger train before moving west. The first of these engines was about 250 feet east of the crossing, and was obscured from the sight of a person approaching from the west along Fulton street by the tobacco warehouse and freight car in front of it until the person arrived at a point about thirty or forty feet from the crossing, but the noise of the escaping steam was plainly audible. A driveway open to public use ran south along the west end of the tobacco warehouse, which could easily be turned into by teams approaching from the west along Fulton street before reaching the railroad crossing.

Hain v. Chicago, M. & St. P. R. Co. 135 Wis. 303.

The plaintiff is a farmer who lived about a mile and a half west of the crossing. His wife raised poultry for the market, and either the plaintiff or his wife took the poultry and eggs twice a week during the year to the depot at Edgerton for the purpose of shipping the same on a train leaving at 10:45 a. m., and used Fulton street in approaching the depot. The wife made these trips most frequently, and always drove the same team attached to a lumber wagon. The team was a gentle team accustomed to the ordinary movement of trains and not afraid of such movement. She was driving this team attached to the wagon on the morning of the accident, having some crates of chickens in the wagon for shipment. She had good sight and hearing, was accustomed to the handling of horses, and was acquainted with the time-tables of the trains. She approached the crossing from the west just prior to the approach of the passenger train.

The testimony of the various witnesses who saw her either before or at the time of the accident is substantially as follows: Alfred Collins, a farmer, was driving towards Edgerton on Fulton street behind Mrs. Hain. As she approached the crossing and was about four or five rods from the crossing of the traveled way over the main track, he was about fifteen or twenty rods behind her at the top of a gentle rise or knoll and was looking at her. He testified that at this point he heard the approaching train whistle west of the cut; that either just before or just after the sounding of the whistle or contemporaneously with it Mrs. Hain stopped her horses at the four or five rod point a few seconds; that she stopped long enough to look both ways; that she looked eastward, but that he could not say whether she looked west; that he did not see her look west; that the train was then way back west of the cut; that she then started the team up at a good trot, using the lines to start them with; that he heard the discharge of steam from the freight engine; that she increased the speed of the team as she got nearer the crossing; and that he

turned his head to look at the train, and in an instant the horses were struck by it. It appears without dispute that at the four or five rod point she could not see the freight engines; that she could then see an engine approaching from the west at a distance of 900 feet, but that the passenger engine must at this time have been considerably farther west and not in sight. No other witness saw her stop at the point testified to by Collins.

Arthur M. Rogers, who was engineer of the head engine on the freight train, testified that he saw Mrs. Hain's horses as soon as they came towards the crossing from behind the tobacco warehouse and freight car and when she was about forty feet from the crossing and the heads of the horses fifteen feet nearer; that he saw her great danger at once; that he blew two short whistle blasts as a danger signal; that simultaneously the engineer of the passenger engine gave the danger signal; that Mrs. Hain looked east toward him; that the horses were going somewhat faster than a walk; that when he gave the danger signal she doubled up the ends of the reins and struck the horses with them once; that she then looked west when she was between ten and fourteen feet of the rail.

Walter B. Rogers, the fireman of the same freight engine, testified that he first saw the horses' heads when they were about thirty feet from the crossing. When he first saw Mrs. Hain she was lashing the horses with the lines and looking toward the freight engine, then she turned and looked the other way, and she kept slapping her horses with the lines all the way; that the danger signal of the passenger engine sounded just a little before that of the freight engine.

A. H. Pritchard, the engineer of the passenger engine, testified that he noticed the team just as he was going out of the cut, perhaps 400 feet from the crossing; that he saw her danger; that she looked west at his train and whipped up her horses; that he instantly gave the danger signal and at-

tempted to stop the train; that she looked west twice, and each time struck the horses again with the reins.

Bert Hallock testified that he was crossing the tracks twelve or fifteen rods east of the crossing, and saw the passenger engine coming pretty fast; that he saw the team just as it passed the end of the freight car; that the freight engine whistled twice; that she looked toward the freight engine; that the horses were just jogging along; that the passenger engine was then coming into the cut; that her whole attention was on the freight engine till she was struck; that he could not say she did not look the other way, and he did not watch her continuously.

Gus Schultz testified that he was in a grocery wagon on the driveway, which runs west of the tobacco warehouse about ten or twelve rods south of the crossing, and saw Mrs. Hain when she was thirty or forty feet from the crossing; that she was leaning over urging her horses and looking right straight down towards the depot and her horses were trotting right along; that the train was just coming out of the cut when he saw her, and he had heard the danger signals.

Mrs. Lizzie Saunders, who lived in a house immediately north of the crossing, testified that while looking from a window she saw Mrs. Hain on Fulton street with her horses walking; that she did not watch her all the time; that later she saw the smoke of the engine in the cut and wondered how near Mrs. Hain was to the crossing, and went to another window which looked out on the crossing and then saw her nearing the crossing; that she raised up in the wagon and lashed the team with both lines, urging the horses on, and they were going as fast as they could go; that she didn't know but what she might turn down the driveway west of the warehouse. There was no obstruction to her doing so; and the next she saw the horses were on the cowcatcher.

Dora Saunders, the daughter of the last witness, was also in the house, and testified that she heard the long whistle of

the engine and looked out and saw Mrs. Hain on Fulton street about 100 feet from the crossing; that she was standing up lashing the horses with the lines, and the horses were trotting; that Mrs. Hain was looking toward the horses; that she did not see her look toward the passenger train at any time; and that when she said she was about 100 feet away it was simply a guess.

No other witnesses were sworn who saw Mrs. Hain or the team before the accident, but several testified as to the speed of the train and as to other facts not materially helpful on the question of Mrs. Hain's conduct. Mrs. Hain and the horses were instantly killed and the wagon destroyed.

The defendant admitted that the proof showed negligence on the part of its employees in running the passenger train at an unlawful rate of speed; and the value of the horses and other property destroyed was agreed on. The plaintiff in his complaint had claimed damages for the death of his wife, but as the suit was brought in his individual capacity only the claim was abandoned, leaving the only issue to be determined by the jury the question whether Mrs. Hain was guilty of contributory negligence.

A special verdict having been requested, the following question was submitted to the jury: "Could deceased, Mrs. Hain, by the exercise of ordinary care have avoided the accident?" which question the jury answered in the negative. A formal question as to the amount of damages was answered by the court pursuant to agreement of the parties. Afterwards the court, on motion of the defendant, changed the answer of the question submitted from "No" to "Yes," and entered judgment for the defendant, from which the plaintiff appeals.

For the appellant there was a brief by *P. H. Martin,* of counsel, and *Ellis, Merrill & Silverwood,* attorneys, and oral argument by *Mr. Martin* and *Mr. T. P. Silverwood.*

For the respondent there was a brief by *J. M. Clancey* and *Chas. E. Vroman,* and oral argument by *Mr. Vroman.*

Winslow, C. J.    It conclusively appears from the evidence that the deceased was in full possession of all her faculties; that she was accustomed to handle horses; that she was driving a gentle team entirely under control at all times; that she was acquainted with the crossing and its surroundings; that she had driven across it frequently at about this same time of day; and that she knew that the train which ran her down was due at about the time she approached the crossing. The long whistle of the approaching passenger train was heard by many people, some of them more distant from it than the deceased, and if Collins's statement be accepted as true she stopped at the time it was blown and then deliberately whipped up her horses to get across the crossing in advance of the train; however, we should not wish to rest the case on the assumption that she heard the whistle.

Taking all the evidence together one of two conclusions must inevitably be reached: Either she looked to the west before she reached the crossing, saw the approaching train, and whipped up her horses in an attempt to cross in front of it, or she did not look west at all (at least until her horses were practically on the track), and was urging her horses forward to get across the track before the freight train should start. In the one case it was a deliberate race with death, in the other case it was an attempt to cross a railroad track without looking to see whether a train was coming. In either case it was negligence under many rulings of this court. The opportunity to look was unobstructed for more than seventy feet before she reached the crossing. As said in *Guhl v. Whitcomb,* 109 Wis. 69, 85 N. W. 142, the duty to look and listen is absolute where the opportunity exists; that duty is not excused by mere diversion of attention, as it may be in highway cases, but there must be circumstances for which the traveler is not responsible which so irresistibly force his attention to something else as to deprive him of his opportunity to perform the duty. *Guhl v. Whitcomb, supra.*

The freight train standing on the passing track was rightfully there, and the fact that it was there was a fact naturally to be expected by one familiar with the station and its surroundings. A fact which a traveler is bound to anticipate as likely to exist as he approaches a railroad crossing cannot logically be held to deprive him of his opportunity to look. *Koester v. C. & N. W. R. Co.* 106 Wis. 460, 82 N. W. 295.

The evidence shows that the deceased could have looked west along the rails of the track more than 1,400 feet before she came in sight of the freight engine, and after coming in sight of it could easily turn her horses out of danger into the driveway west of the tobacco warehouse. Under well-established rules there can be no recovery under the evidence before us, as sad as the circumstances admittedly are.

*By the Court.*—Judgment affirmed.

Siebecker and Timlin, JJ., dissent.